IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

FILED
NOV - 4 2014
Clerk, U.S. District Court
District Of Montana
Billings

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>FERNANDO MEDINA,<br><br>Defendant. | CR 13-112-BLG-SPW<br><br>OPINION AND ORDER |

Defendant Fernando Medina ("Medina") moves to suppress evidence found during a vehicle search and to dismiss under the Speedy Trial Act. On October 23, 2014, the Court held an evidentiary hearing, wherein it heard testimony from Montana Highway Patrol Sergeant Troy Muri ("Sgt. Muri") and Agent Richard Smith ("Agent Smith") of the Montana Department of Justice Division of Criminal Investigations. In addition, the Court reviewed the video from Sgt. Muri's patrol car. For the following reasons, the Court denies Medina's motion.

## I. Background

In the early afternoon of October 9, 2013, Sgt. Muri and Agent Smith were patrolling in Sgt. Muri's marked patrol car and conducting criminal interdiction in the Glendive, Montana area. At the time, Agent Smith was assigned to the Drug Enforcement Agency as a task force officer. While driving west-bound on

Interstate 90, Sgt. Muri noticed a blue Dodge Intrepid with dark window tinting heading east and travelling in the left lane. The blue car was travelling about 75-76 miles per hour and was attempting to pass a semi-truck in the right lane. As Sgt. Muri passed the car, it slowed down to around 71 miles per hour, aborted its attempt at passing the semi-truck, and pulled in behind the truck in the right lane. Sgt. Muri considered this behavior odd, because during his 15 years with the Montana Highway Patrol, it was his experience that typical drivers accelerate when passing large trucks.

Accordingly, Sgt. Muri made a U-turn and crossed the median into the east-bound lane. He saw the car turn off I-90 at the next exit. The exit was clearly marked as having "no services," meaning that no gas stations, restaurants, or restrooms existed near the exit. Sgt. Muri followed the car off the interstate and observed as it drove down a gravel road at approximately 15-20 miles per hour. The car continued for about half a mile before reaching a "T" intersection. The car turned right down another gravel road. Sgt. Muri followed and observed no other vehicles on the road. As he was following the car, Sgt. Muri noticed that it had California license plates. Given that the car had unexpectedly terminated its lawful attempt to pass a vehicle on the interstate when Sgt. Muri's patrol car approached, immediately exited the interstate, and proceeded down various gravel roads with no facilities in the area in a car with out of state plates, Sgt. Muri and Agent Smith

believed that the car's driver was attempting to avoid contact with law enforcement.

About a half mile down the second gravel road, the car signaled and turned into a farmhouse's driveway. Sgt. Muri did not activate his siren or lights. Sgt. Muri pulled in and parked in a way that did not to block the car's exit. No other vehicles were present, and the nearby house, garages and sheds appeared unoccupied.

Sgt. Muri exited his patrol car and approached the car. Agent Smith remained in the patrol car. The car's driver, later identified as Medina, already had his window rolled down. Sgt. Muri asked Medina if he lived at the house, to which Medina answered negatively but volunteered that he worked in Glendive. Glendive is about 10 miles from the house. When asked what he was doing, Medina answered that he was meeting his boss there. Sgt. Muri asked what kind of work they did, and Medina said they did landscaping. Sgt. Muri asked if they were landscaping the farmhouse. Medina said no but they were going to landscape a house up the road. Medina then provided a different reason for pulling into the driveway and said that he believed the officers in the patrol car wanted to talk to him.

Sgt. Muri asked for Medina's identification. Medina said he was from Mexico and did not have any identification. Sgt. Muri requested Medina stop

smoking.  Medina complied and tossed his cigarette out the car window.  Sgt. Muri

told Medina to pick it up; throwing the cigarette on the ground was littering.

Medina opened the car door slightly and picked up the cigarette.

Sgt. Muri opened the car door further and positioned himself so that Medina

could not close the door.  Sgt. Muri then asked for Medina's Mexican

identification.  Medina repeated that he did not have any identification.  He handed

Sgt. Muri a ticket he received in Wyoming the previous day for driving without a

license.  The ticket identified him as "Fernando S. Lopez," but it did not contain

any other identifiers.  Sgt. Muri asked Medina why he was in Wyoming, and

Medina responded that his daughter was in a Gillette hospital for nine days with a

high fever.  Medina explained that although his daughter remained in the hospital,

he had to return to work.  In response to further questioning, Medina said that the

car belonged to his male cousin "Ana" from California.  Medina added that he was

supposed to be at work that morning at 7 A.M.

Medina provided his full name as "Fernando Soltero Lopez" and gave a date

of birth.  Sgt. Muri told Medina to "sit tight" while he returned to his patrol car.

During the conversation, Sgt. Muri observed that Medina appeared nervous and

hesitated before providing answers.

Sgt. Muri returned to his patrol car and informed Agent Smith that Medina's

story was "jacked up."  Agent Smith, who listened to the conversation via Sgt.

Muri's recording device, agreed. Sgt. Muri called in the name and date of birth Medina had provided for a records check.

While Sgt. Muri conducted the records check, Agent Smith exited the patrol car and approached Medina's vehicle. Medina remained seated in the driver's seat, and Agent Smith stood between the open door and car. With a relaxed demeanor and a calm voice, Agent Smith asked Medina his reason for travel and where he was headed. Medina provided answers consistent with what he gave Sgt. Muri.

Agent Smith then posed a detailed question to Medina: "Can I have your consent to search the vehicle you're operating for methamphetamine, cocaine, marijuana, prescription pills or illegal weapons?" Medina responded with "Go ahead. Do whatever you want." Agent Smith asked Medina if he had any of those items in the vehicle. Medina responded negatively and said that Wyoming police searched the vehicle the day prior.

Sgt. Muri's records check took approximately 10-15 minutes. It produced no results. While Sgt. Muri was waiting on the records check, Montana Highway Patrol Sergeant Kelly Mantooth ("Sgt. Mantooth") arrived with his K-9, Tika. Agent Smith returned to the patrol car and informed Sgt. Muri that Medina consented to a search of his car.

Sgt. Muri returned to Medina and said that he would not issue him a ticket. He explained that he was concerned with the way Medina exited I-90 and pulled

5

into the farmhouse's driveway. Medina told Muri that he pulled into the farmhouse because he does not have a license. Sgt. Muri asked, "Can you step out for a second here?" Medina complied and exited the car. Sgt. Muri then asked, "Do you mind if we run the dog really quick?" Medina gave permission for the canine sniff. Sgt. Muri patted Medina down for weapons, and Medina either sat or stood under a nearby tree during the search.

Sgt. Mantooth ran Tika around Medina's car. Tika indicated to the presence of illegal drugs and alerted behind the front passenger side wheel. Sgt. Mantooth told Sgt. Muri that drugs were likely around the glove box. Sgt. Muri asked Medina, "Do you mind if I check to make sure there's nothing illegal?" Again, Medina consented.

Sgt. Muri and Agent Smith began to search Medina's car. Sgt. Muri admits that they turned Medina's car "inside out" during the search. Eventually, Agent Smith found a handgun and a sock containing little bags of methamphetamine in the dash area. A records search on the handgun revealed that it was reported stolen in California. Medina was arrested. After receiving the *Miranda* warnings, Medina told Agent Smith that his wallet was located in the center consol. Sgt. Muri found the wallet, and inside it was Medina's correct identification. A records check on Medina revealed an outstanding warrant from California.

Both Sgt. Muri and Agent Smith believed that Medina merited federal prosecution. In fact, Agent Smith informed Medina he would likely be prosecuted federally. However, Medina was booked on a state drug charge and arraigned in Dawson County on October 22, 2013. Medina posted a $30,000 bond and was released to attend to his California warrant.[1] Medina appeared on his California warrant and served jail time. The federal grand jury indicted him on the instant charges on December 5, 2013. Federal officials arrested Medina on May 14, 2014, after he was released from the California jail. Following his federal arrest, the state of Montana dismissed its drug charge against Medina.

## II. Discussion

Medina moves to suppress evidence found during the search on three grounds: (1) there was no reasonable suspicion to justify stopping Medina's vehicle; (2) Medina did not voluntarily consent to the search; and (3) even if he consented, the search exceeded the scope of consent given. In addition, Medina moves to dismiss as the U.S.A. did not indict him within thirty days of his arrest.

---

[1] No evidence of this came via testimony or through attached supporting documents. Rather, Medina introduces this information in "brieffidavit" form. (Doc. 27-1 at 4). As this information is pertinent to his argument regarding the Speedy Trial Act, this Court will assume it is true.

## A. Medina was not seized until Sgt. Muri developed ample reasonable suspicion.

The first issue hinges on when Medina was seized. Medina contends that Sgt. Muri seized him when he stopped at the farmhouse. As Sgt. Muri did not possess the necessary reasonable suspicion to justify a stop of Medina at that point, Medina argues that any evidence obtained subsequent to the stop should be suppressed. The U.S.A. argues that Medina was not seized until after Sgt. Muri started conversing with Medina and developed reasonable suspicion. The Court agrees with the U.S.A.

Under the Fourth Amendment, "a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." *United States v. Drayton*, 536 U.S. 194, 201 (2002). There is not a seizure every time a person does not feel free to leave; rather, a seizure only occurs "when there is a governmental termination of freedom of movement *through means intentionally applied*." *United States v. Al Nasser*, 555 F.3d 722, 728 (9th Cir. 2009) (emphasis in original) (quoting *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1988)).

When the encounter is voluntary, the Fourth Amendment is not implicated. *United States v. Summers*, 268 F.3d 683, 686 (9th Cir. 2001). This includes situations

where "a law enforcement officer merely identifies himself and poses questions to a person if the person is willing to listen." *United States v. Washington*, 490 F.3d 765, 770 (9th Cir. 2007).

Several cases demonstrate that no seizure occurred when Medina stopped at the farmhouse and Sgt. Muri pulled in behind him. In *United States v. Judge*, 501 F.2d 1348 (9th Cir. 1974), a Border Patrol agent spotted a truck that he suspected was smuggling aliens but had little articulable facts to justify a stop. The agent followed the truck in his marked car, and eventually the truck pulled into a parking lot without any prompting by the agent. *Id.* The agent approached the driver's window and asked to inspect the truck. The driver agreed, and the subsequent search revealed 1,100 pounds of marijuana. *Id.* at 1349. The Court concluded that since the driver "stopped his car voluntarily and [the agent] in no way ordered or requested him to do so, there was no 'stop' of the vehicle as would require a 'founded suspicion' on the part of [the agent]." *Id.*

Similarly, in *Summers*, an officer observed Summers acting strangely near a Goodwill drop station. 268 F.3d at 685. The officer parked in a manner that did not block the path of Summers' car and exited his marked patrol car. *Id.* He asked Summers what he was doing and asked him for identification. *Id.* When Summers denied having identification, the officer asked if he owned the nearby vehicle. *Id.* Summers answered affirmatively, and the officer asked for verification. *Id.* As

Summers entered the car, the officer noticed a shotgun lying under the glove box. *Id.* The officer asked Summers to step away from the car, resulting in a failed escape attempt. *Id.*

The Court held that Summers was not seized during the officer's questioning, as the interaction was voluntary. *Id.* at 687. The officer never activated his lights or sirens. *Id.* Nothing prevented Summers from driving or walking away. *Id.* Although the officer asked Summers for identification and for the vehicle's registration, the questions were not forceful demands. *Id.*

Similar to *Judge*, Sgt. Muri suspected that Medina was avoiding law enforcement contact, but likely did not have sufficient articulable facts to justify a stop. Also like in *Judge*, Medina pulled into the driveway of his own volition without Sgt. Muri activating his lights and sirens. While Medina may have believed that Sgt. Muri wanted him to pull over, the inquiry is not just whether Medina reasonably believed he was seized. Rather, there is only a seizure when law enforcement intentionally applies means to restrict the defendant's freedom of movement. *Al Nasser*, 555 F.3d at 728. Sgt. Muri did not intentionally apply any means to stop Medina or restrict his movement. Medina voluntarily pulled into the farm house's driveway without any prompting by Sgt. Muri.

Like in *Judge* and *Summers*, Sgt. Muri questioned Medina about his identification and his activities, but did not restrain Medina's movement. As in

*Summers*, Sgt. Muri did not block Medina's exit with his patrol car. Contrary to

Medina's assertion that Sgt. Muri "immediately got out of his cruiser and shouted

questions at Medina in a threatening, authoritative manner" (Doc. 27-1 at 10), the

video shows that Sgt. Muri was calm and used a normal tone of voice. His line of

questioning mirrors the questions the officer asked in *Summers*. None of the

circumstances indicate that Medina was seized when he pulled into the driveway

and started answering Sgt. Muri's initial questions.

The question then turns to when Sgt. Muri seized Medina for further

investigation. The U.S.A. does not suggest a precise moment when Medina was

seized. The Court finds that the earliest that Sgt. Muri could have seized Medina

was when he further opened the car door and positioned himself between the car

and the door. Even assuming that a seizure occurred at that point, Sgt. Muri had

developed ample reasonable suspicion to further investigate Medina.

The Fourth Amendment allows police to conduct brief investigative stops if

the officer possesses "reasonable suspicion to believe that criminal activity may be

afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "Reasonable suspicion

requires specific, articulable facts which, together with objective and reasonable

inferences, form a basis for suspecting that a particular person is engaged in

criminal conduct." *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000)

(internal quotations omitted). When considering whether officers have reasonable

11

suspicion, courts should look at the totality of the circumstances. *Arvizu*, 534 U.S. at 273. Each fact cannot be considered individually and must be evaluated in the context of the case. *United States v. Valdes-Vegas*, 738 F.3d 1074, 1078 (9th Cir. 2013). A series of factors, that when looked at individually are consistent with innocent behavior, can amount to reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 9-10 (1989). A determination of reasonable suspicion "need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277. While a mere hunch or speculation cannot create reasonable suspicion, "the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence." *Navarette v. California*, __ U.S. __, 134 S.Ct. 1683, 1687 (2014) (internal quotations omitted).

By the time Sgt. Muri inserted himself between the driver's door and the car, articulable facts supported his belief that Medina was engaged in criminal activity. Apparently after spotting the patrol car, Medina decelerated and aborted a lawful attempt at passing a semi-truck. Medina makes much of the fact that he never broke the speed limit. However, the manner in which he was driving led Sgt. Muri to believe that Medina was behaving suspiciously. Medina was compliant with the speed limit when he began overtaking the semi-truck. Presumably upon viewing a Highway Patrol cruiser, Medina decelerated by about 5 miles per hour, aborted his attempt to pass the semi-truck, and instead fell in behind the semi-truck. In Sgt.

Muri's fifteen years of Montana Highway Patrol service, this maneuver was unusual and inconsistent with the innocent motoring public.

Medina then took the next exit after Sgt. Muri crossed the median. This was a rural "no services" exit with no nearby businesses. Sgt. Muri noticed that Medina's vehicle had California license plates, and typically only the property owners take these "no services" exits to get to their property. After driving about a mile along the quiet gravel roads, Medina pulled into the driveway of an unoccupied farmhouse. Medina then provided conflicting and improbable information to Sgt. Muri. Medina also admitted to being from Mexico and not having identification, including a driver's license. Sgt. Muri observed that Medina appeared nervous.

In viewing the totality of the circumstances, Sgt. Muri had reasonable suspicion to believe that Medina was engaged in criminal activity. In Sgt. Muri and Agent Smith's experience, Medina's driving was consistent with somebody avoiding law enforcement. Rather than dispel Sgt. Muri's concerns, Medina's answers reinforced them. Sgt. Muri and Agent Smith permissibly seized Medina temporarily for further investigation.

B. Medina's consent was voluntary.

Medina's next argument is that he did not freely consent to the search. He contends that the "consent was clearly not voluntary considering the totality of the circumstances." (Doc. 27-1 at 13). The Court disagrees.

Voluntarily-given consent is a recognized exception to the Fourth Amendment's protection against unreasonable searches. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Courts consider five factors to determine whether consent was voluntary:

> (1) whether defendant was in custody; (2) whether the arresting officers have their guns drawn; (3) whether *Miranda* warnings have been given; (4) whether the defendant was told he has a right not to consent; and (5) whether defendant was told a search warrant could be obtained.

*United States v. Russell*, 664 F.3d 1279, 1281 (9th Cir. 2012). No factor is dispositive, and the totality of the circumstances must be considered. *Washington*, 490 F.3d at 775-76. The government bears the burden of showing that the defendant freely and voluntarily consented. *Russell*, 664 F.3d at 1281.

The first factor favors the U.S.A., as Medina was not in custody. While he was subject to an investigative stop, Medina was not "in custody" for purposes of determining whether his consent was voluntarily given. *United States v. Torres-Sanchez*, 83 F.3d 1123, 1129-30 (9th Cir. 1996); *see also United States v. Basher*, 629 F.3d 1161, 1168 (9th Cir. 2011) (holding that the defendant was not in custody

14

when he consented to a search, despite the fact that he was subject to an investigatory stop); *United States v. Zurmiller*, 247 F. Supp. 2d 1161, 1170 (D. Mont. 2003) (holding that the defendant was not in custody during an investigatory stop).

The second factor favors the U.S.A., as Sgt. Muri and Agent Smith did not draw their guns. The third factor is inapplicable. *Washington*, 490 F.3d at 776. Medina contends that this factor cuts in his favor; however the absence of *Miranda* warnings when they are not required does not favor either party. *Russell*, 664 F.3d at 1281; *see also United States v. Ritter*, 752 F.2d 435, 438 (9th Cir. 1985) ("There is…no basis for the suggestion that a request to search must be preceded by *Miranda* warnings, or that the lack of prior *Miranda* warnings vitiates a consent to search.").

The fourth factor favors Medina, as nobody informed him of his right to refuse to consent. However, an "officer is not *required* to inform the person being searched that he has a right to refuse consent; doing so simply weighs in favor of finding consent." *United States v. Vongxay*, 594 F.3d 1111, 1120 n. 6 (9th Cir. 2010) (emphasis in original). Finally, the fifth factor favors the U.S.A., as the officers did not tell Medina they could simply obtain a search warrant if he refused consent. *Russell*, 664 F.3d at 1282.

The totality of the circumstances shows that Medina freely and voluntarily consented to the search of his car. Only the fourth factor favors Medina. In addition, a review of the circumstances shows that Medina freely consented. The atmosphere was not coercive. Medina actually consented twice: once to Agent Smith while Sgt. Muri ran the first records check; and again to Sgt. Muri after Tika alerted on the car. Both times, Medina consented voluntarily.

## C. Law enforcement's search did not exceed the scope of Medina's consent.

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Courts should consider the whole factual context of the search when deciding whether it exceeded the scope of consent. *Russell*, 664 F.3d at 1282. The permissible scope is generally defined by its expressed object. *Jimeno*, 500 U.S. at 251. When somebody consents to the search of a car, that consent is construed broadly to include the search of containers contained within the car. *Id.* As the Supreme Court recognized, "[c]ontraband goods rarely are strewn across the trunk or floor of a car." *Id.* (quoting *United States v. Ross*, 456 U.S. 798, 820 (1982)). Therefore, when somebody consents to a search of their car for contraband, he should expect the officers to search compartments and containers within the car. This includes

the interior of the car, the glove box, and the trunk. *United States v. Cannon*, 29 F.3d 472, 477 (9th Cir. 1994).

For example, in *United States v. McWeeney*, an officer stopped a car for a reason unrelated to the ultimate charge. 454 F.3d 1030, 1032 (9th Cir. 2006). After the passengers denied having anything that "they were not supposed to have," the officer asked them "if they minded if he looked in the car." *Id.* (modifications omitted). The passengers consented. *Id.* at 1032-33. After examining the passenger compartment, the officer opened the trunk. *Id.* at 1033. The officer noticed that the trunk's carpet was loose. *Id.* He pulled the carpet back and found an illegally-possessed handgun. *Id.*

The Court found the officer did not exceed the defendant's general consent by searching the trunk. *Id.* at 1034. The Court found that a reasonable person would understand that the officer would look for weapons and narcotics. *Id.* at 1035. With that knowledge, "the reasonable person would expect him to search the trunk and look under loose carpet." *Id.*[2]

The Ninth Circuit reached a similar result in *United States v. Gutierrez-Mederos*, 965 F.2d 800 (9th Cir. 1992). In *Gutierrez-Mederos*, an officer stopped the defendant for an improper lane change. *Id.* at 802. The officer asked if any

---

[2] While the Ninth Circuit found this search did not exceed the scope of the original grant of consent, the Court remanded for factual findings as to whether the officers improperly coerced the defendant into not revoking his consent when they started looking in his trunk. *McWeeney*, 454 F.3d at 1035-1037.

drugs or weapons were in the car, to which the defendant answered negatively. *Id.*

The defendant then consented to a search. *Id.* The officer removed keys from the

hatchback lock and used them to open a side compartment panel inside the

hatchback area. *Id.* Inside the compartment, the officer noticed a loose cardboard

divider. *Id.* The officer pulled the divider away and discovered drugs and guns.

*Id.*

The Court found that the search did not exceed the scope of consent. *Id.* at

803. The defendant knew that the officer was looking for guns and drugs, and

therefore gave consent for the officer to search any area that could contain

contraband. *Id.* at 803-04. A reasonable person would expect the officer to look

inside the compartments. *Id.* at 804.

Medina contends in his briefs that law enforcement exceeded the scope of

any consent given by using "mechanic's tools" to "virtually dismantle[]" the

dashboard. (Doc. 27-1 at 15; *see also* Doc. 31 at 4 ("they tore the car apart and

dismantled it with their own tools.")). However, at the hearing Medina did not

elicit any testimony regarding the drugs' specific location, much less anything

about the use of tools to dismantle Medina's car. In Sgt. Muri's report, he

indicates that Agent Smith found the gun and the methamphetamine "in the dash

area." (Doc. 18-2 at 3). Agent Smith reported that he found the contraband

"secreted in the dashboard on top of the radio case." (Doc. 18-3 at 3). Therefore,

the Court does not find that Sgt. Muri and Agent Smith took apart the car before finding the drugs and gun. Even assuming Agent Smith entered a secret compartment to locate the illegal items, the search did not exceed the scope of consent.

Similar to *McWeeney* and *Gutierrez-Mederos*, Medina understood that law enforcement would search for drugs. Agent Smith and Sgt. Muri left no room for misunderstanding. Smith specifically asked if he could check the car for drugs and guns. Sgt. Muri first asked Medina if they could run the drug dog around the vehicle and, after the dog alerted on it, Sgt. Muri asked Medina if he minded if they searched the car. Medina knew that Sgt. Muri and Agent Smith would be looking for contraband when he consented to the search. Accordingly, Medina knew the officers would search any nooks and hidden compartments. Items hidden in the dash area is analogous to the items found in the hidden compartment in *Gutierrez-Mederos* and under the loose carpet in *McWeeney*. The officers did not exceed Medina's express grant of consent to search.

D. The Speedy Trial Act was not violated.

Medina's final argument is that the U.S.A. violated the Speedy Trial Act, as he was not indicted within 30 days of his arrest. As discussed above, Medina was arrested on a state drug charge on October 9, 2013. The grand jury indicted him on December 5, 2013.

The U.S.A. must indict a defendant within 30 days of his arrest. 18 U.S.C. § 3161(b). "Regardless of the degree of federal involvement in a state or tribal investigation and arrest, only a *federal* arrest will trigger the running of the time period set forth in 18 U.S.C. § 3161(b)." *United States v. Manuel*, 706 F.2d 908, 915 (9th Cir. 1983) (emphasis in original). However, there may be a Speedy Trial Act violation if state and federal officials collude to keep the defendant in custody while the U.S. builds a stronger case against him. *United States v. Benitez*, 34 F.3d 1489, 1494 (9th Cir. 1994). That situation is not present under these facts.

*Benitez* is directly on point. In *Benitez*, the F.B.I. operated an undercover drug investigation. *Id.* at 1492. After the defendants met with undercover agents to launder money, the F.B.I. agents arrested the defendants. *Id.* Despite the federal nature of the investigation, the defendants were initially charged with state crimes. *Id.* They remained in state custody until about 45 days later, when a federal grand jury indicted the defendants. *Id.*

Although they were indicted more than 30 days after their arrest by federal officials, this delay did not violate 18 U.S.C. § 3161(b) because the defendants were arrested on state charges, not federal charges. *Id.* at 1493. The Court held "that the arrest by federal officers who immediately relinquished control of the arrestees to state officials for state prosecution did not trigger the thirty day period of § 3161(b)." *Id.* at 1494. The Court recognized that "Speedy Trial Act time

periods may be triggered by state detentions that are merely a ruse to detain the defendant solely for the purpose of bypassing the requirements of the Act." *Id.* However, the Court found no collusion by state and federal officials. *Id.* at 1494-95.

Here, there is no evidence that state and federal officials colluded to keep Medina imprisoned so the federal government could build its case. While Sgt. Muri and Agent Smith believed the case merited federal prosecution, they do not make that decision. The U.S. Attorney decides who to charge federally. In fact, Agent Smith admits to previous cases that he believed warranted federal prosecution but the U.S. Attorney declined to prosecute them.

In *Benitez*, there was no violation of § 3161(b), even though state prosecuting attorneys and federal attorneys repeatedly discussed whether the U.S.A. intended to file charges. *Id.* at 1494-95. Here, there was not even that level of cooperation. In fact, the state allowed Medina to post bond and leave for California. The U.S.A. did not violate § 3161(b) by waiting until December 5 to indict Medina.

### III. Conclusion

For the reasons discussed above, Medina's Motion to Suppress and Dismiss (Doc. 27) is DENIED.

DATED this __4th__ day of November 2014.

SUSAN P. WATTERS
United States District Judge